UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Hon. Peter G. Sheridan, U.S.D.J. |
| v. | Crim. No. 88-239 (PGS) |
| RICHARD DESCISCIO | |

OPPOSITION OF THE UNITED STATES TO DEFENDANT'S MOTION FOR REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(I)

CRAIG CARPENITO
UNITED STATES ATTORNEY
DISTRICT OF NEW JERSEY

ON THE BRIEF:
ALEXANDER RAMEY
ASSISTANT UNITED STATES ATTORNEY

Defendant Richard DeSciscio ("DeSciscio") has filed a motion seeking an order reducing his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and ordering his immediate release, as a result of the COVID-19 pandemic. The United States respectfully opposes the motion because DeSciscio fails to establish "extraordinary and compelling reasons" warranting relief, and, in light of the seriousness of his offense, because release would not be consistent with the relevant sentencing factors set forth in 18 U.S.C § 3553(a)

BACKGROUND

On August 25, 1988, DeSciscio was charged with participating in a conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO") in 6 counts of a 26-count Indictment in the matter of *United States v. Louis Anthony Manna, et al.*, No. 88-cr-239. DeSciscio proceeded to trial, and, on June 26, 1989, was convicted on all counts with which he was charged, including violations of 18 U.S.C. § 1952 (RICO conspiracy to murder John Gotti, Gene Gotti, and Irwin Schiff, and participation in the murder of Irwin Schiff); 18 U.S.C. § 1955 (conducting an illegal gambling business); and 18 U.S.C. § 1962 (racketeering). On September 26, 1989, the Hon. Marianne Trump Barry, U.S.D.J., sitting in this District, sentenced DeSciscio to a term of 75 years of imprisonment for his crimes.

DeSciscio's offense conduct is set forth in detail in the August 28, 1989 Presentence Report ("PSR"). In sum, DeSciscio was a member of the Genovese Crime Family of La Cosa Nostra, who operated within a faction controlled by Genovese Consigliere (third-in-command), Louis Anthony Manna. PSR, ¶¶ 1, 26. "DeSciscio's special role [within the Family] was to assist in enforcement for the group's criminal activities such as gambling, including the use of violence." *Id.* at ¶ 29. Beginning in September 1987, DeSciscio, Manna, and others

engaged in a conspiracy to murder John Gotti, the boss of the Gambino Family of La Cosa Nostra, and his brother Gene Gotti, who was also a member of that organization. *Id.* at ¶ 30. In a meeting with Manna, DeSciscio, and another individual, it was agreed that DeSciscio and two others would carry out the "hit," or murder of the Gottis. Recorded communications between conspirators confirmed the plan to murder the Gottis. *Id.* at ¶ 31.

During the period of late 1986 into early 1987, Irwin Schiff was a hidden principal in a network of companies and corporate shells that were engaged in a multi-million-dollar fraud and money laundering scheme operated for the benefit of the Genovese Family. *Id.* at ¶ 32. Manna ordered Schiff's murder, and, on August 8, 1987, an unidentified masked gunman emerged from the restroom area of the Upper East Side restaurant where Schiff was dining and shot Schiff twice in the head. *Id.* at ¶¶ 32-33. DeSciscio was present at the scene of the murder to assist in the "hit" on Schiff. *Id.* at ¶ 33. In recorded communications, DeSciscio, Manna, and others referred to the Schiff murder while planning the Gotti murders. *Id.* at ¶ 34.

DeSciscio was also responsible for attending to the day-to-day problems of running a wide-spread and prosperous gambling network in Hudson County, supervised by Manna and others. *Id.* at ¶ 55. As part of his responsibilities, DeSciscio was charged with carrying out threats of force and committing acts of violence. PSR, ¶ 55. For example, during one discussion among the management of the gambling network, one of the supervisors told DeSciscio that they should "hit" one of their gambling operatives to teach all of the operatives a lesson. *Id.*

In preparing the PSR, the United States Probation Office summarized DeSciscio's relative role within the conspiracy as follows: "DeSciscio was an enforcer for the group. He served as an intermediate level supervisor for the

3

gambling operation, resolving problems for Casella [a higher-ranked member of the Genovese Family]. Consequently, DeSciscio was a supervisor of extensive racketeering activity involving five or more persons." *Id.* at ¶ 61.

DeSciscio denied all culpability for the charged offenses. *Id.* at ¶¶ 66-67.

DeSciscio appealed his conviction after trial, and the Third Circuit affirmed on all counts on November 21, 1990. DeSciscio collaterally attacked his conviction by filing petitions under 28 U.S.C. §§ 2244 and 2255, which were denied.

Defendant has served approximately 31 years and 9 months of his sentence and is currently housed at Allenwood Federal Correctional Institution Medium ("FCI Allenwood Medium"), a medium security facility that is part of the larger Allenwood Federal Correctional Complex ("FCC Allenwood"). He is scheduled to be released on July 5, 2052.

As set forth in detail in the attached Affidavit from the Executive Assistant of FCI Allenwood Medium, on March 13, 2020, the Federal Bureau of Prisons ("BOP") began to modify its operations in accordance with its preexisting plans to address and minimize the risk of COVID-19 transmission into and inside its facilities. Ex. A, ¶ 6. Those modifications include implementing body temperature and respiratory symptom screening procedures for all staff and inmates in BOP facilities. *Id.* at ¶ 9. Staff who fail screenings are not permitted entry into work, while inmates who fail screenings are placed in isolation until cleared by a negative test for COVID-19 or otherwise medically cleared pursuant to Centers for Disease Control ("CDC") criteria. *Id.* at ¶ 9. Inmates who may have been exposed to a symptomatic inmate are placed into quarantine for 14 days or until medically cleared. *Id.* Contractor access to facilities has been restricted and social and legal visits have been stopped altogether. *Id.* ¶¶ 10-11.

4

Staff and inmates of FCI Allenwood Medium have been issued appropriate personal protective equipment ("PPE"), including face coverings and are required to wear the face coverings when in public areas when social distancing cannot be achieved. *Id.* at ¶ 18. At present, there are zero confirmed or suspected COVID-19 cases at FCC Allenwood, including FCI Allenwood Medium. Historically, there have been, in total, two positive tests for COVID-19 among staff at FCC Allenwood: one at FCI Allenwood Medium and one at United States Penitentiary Allenwood, a high security facility in the complex. Both cases occurred in March 2020, and both affected staff members have now fully recovered. To date, no inmates at any of the FCC Allenwood facilities have tested positive for COVID-19. *Id.* at ¶ 19.

In addition to the enhanced safety measures, since March 26, 2020, the BOP, at the direction of the Attorney General, has been exercising greater authority to designate inmates for home confinement. *Id.* at ¶ 13. The BOP has not exercised its discretion to transfer DeSciscio for home confinement because he is not a priority candidate due to a violent primary offense, Medium Security Classification Level and Low Risk Recidivism PATTERN score. *Id.* at ¶ 20.

DeSciscio's daughter filed a letter request seeking his compassionate release with the BOP, which was received by the Warden of the FCC on April 10, 2020. DeSciscio's daughter sought his compassionate release on the basis of his age (78), the length of time he has served on his sentence (30+ years), his health (including having a pacemaker and being treated for cancer), and his risk of death or injury from the COVID-19 virus. ECF No. 5-3. The BOP considered the request, denied it in a letter dated April 28, 2020. ECF No. 5-4. The BOP explained that the request "has been reviewed in accordance with Program Statement, 5050.50. [DeSciscio's] medical condition does not limit his ability to perform activities of daily living or has imposed serious cognitive

5

defects. After a comprehensive review of Mr. DeSciscio's circumstances, he is not eligible for Compassionate Release/RIS [reduction in sentence] placement." *Id.* DeSciscio did not seek an administrative appeal of the denial of his daughter's request, but instead, on April 26, 2020, submitted a new request for compassionate release explicitly based on Program Statement 5050.49 – the immediate predecessor that was superseded by 5050.50 – on the grounds of being 65 years old or older and suffering from serious medical conditions related to the aging process resulting in deteriorating physical health, diminishing his ability to function in a correctional institution. ECF No. 5-5. That request was returned to him on procedural grounds, namely, that he needed to invoke the current Program Statement 5050.50, on May 4, 2020. ECF No. 5-6. On May 13, 2020, DeSciscio moved before this Court under 18 U.S.C. § 3582(c)(1)(A) for a reduction in sentence resulting in his immediate release from the custody of the BOP due to, *inter alia*, the threat posed by the COVID-19 pandemic. That motion is now before the Court, and, as set forth below, should be denied.

<u>LEGAL FRAMEWORK</u>

Under Title 18, United States Code, Section 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that the BOP file such a motion on his or her behalf. 18 U.S.C. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion is filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from

the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014). As the statute makes clear, compassionate release is a "rare" and "extraordinary" form of relief. *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

"Congress did not define the term 'compelling and extraordinary reasons,' but instead directed the Sentencing Commission to define the term." *United States v. Epstein*, No. CR 14-287-1 (FLW), 2020 WL 2537648, at *3 (D.N.J. May 19, 2020) (citing 28 U.S.C. § 994(t) (providing that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples")). *See also* § 994(t) ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.") Consistent with 28 U.S.C. § 994(t), the Sentencing Commission issued a policy statement, U.S.S.G. § 1B1.13 (the "Policy Statement"), addressing reduction of sentences under § 3582(c)(1)(A). The Policy Statement provides that a court may reduce a defendant's term of imprisonment after considering the § 3553(a) factors, if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person

or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[1] The Policy Statement further includes an application note that specifies the types of conditions and combinations of circumstances that qualify as "extraordinary and compelling reasons" for release.

First, the requirement of "extraordinary and compelling reasons" is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." Application Note 1(A)(i) to U.S.S.G. § 1B1.13 ("Subsection A(i)").

Second, the requirement is met if the defendant is (I) suffering from a serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, or (III) experiencing deteriorating physical or mental health because of the aging process, *and* that condition, impairment, or deteriorating state of health substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility *and* from which condition, impairment, or deteriorating state of health the defendant is not expected to recover. Application Note 1(A)(ii) to U.S.S.G. § 1B1.13 ("Subsection A(ii)").

---

[1] The Policy Statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

Third, the requirement is met if the defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less. Application Note 1(B) to U.S.S.G. § 1B1.13 ("Subsection B").

Fourth, the requirement is met by certain family circumstances, including the death or incapacitation of the caregiver of a defendant's minor children or the incapacitation of the defendant's spouse, subject to additional limitations. Application Note 1(C) to U.S.S.G. § 1B1.13 ("Subsection C").

Fifth and finally, the Application Notes to the Policy Statement recognize the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." Application Note 1(D) to U.S.S.G. § 1B1.13 ("Subsection D").

As explained in more detail below, in his present motion before the Court, DeSciscio appears to seek relief under 18 U.S.C. § 3582(c)(1)(A)(i) by attempting to establish "extraordinary and compelling reasons" for release under Policy Statement Application Note Subsections A(ii), B, and D.

<u>ARGUMENT</u>

Here, DeSciscio has exhausted his administrative remedies, but has failed to carry his burden to show that compassionate release is warranted under Section 3582(c)(1)(A). DeSciscio raises two distinct sets of arguments in support of his motion for compassionate release. First, he argues that, under BOP Program Statement 5050.50, he is "entitled to compassionate release as a matter of law." *See* ECF No. 5, Argument Section II, pp. 5-9. As explained below, this argument is simply wrong on the law and does not provide the defendant with an avenue for relief before this Court. Second, DeSciscio argues

9

that he has satisfied the criteria for compassionate release under Section 3582(c)(1)(A)(i) and the Policy Statement, Subsection D. ECF 5, pp. 12-16. Although properly raised before this Court, this argument too fails because (i) he has not identified "extraordinary and compelling reasons" for that reduction within the meaning of § 3582(c)(1)(A)(i) and the Policy Statement, and (ii) the statutory sentencing factors of § 3553(a) overwhelmingly counsel against granting DeSciscio relief. In rebutting this second set of arguments, the United States also addresses DeSciscio's motion as if attempting to establish "extraordinary and compelling reasons" under Policy Statement Subsections A(ii) and B because, although these provisions are not invoked, the structure of DeSciscio's argument clearly appears to reference their content.

A.  <u>The Defendant Has Exhausted His Administrative Remedies.</u>

As a threshold issue, as explained above, Section 3582(c)(1)(A) requires that a request for a reduction in sentence be presented first to the BOP for consideration. Only after 30 days have passed, or the defendant has exhausted all administrative rights to appeal the BOP's denial or failure to act, may a defendant move for a sentence reduction in court. That restriction is mandatory and continues to serve an important function during the present crisis. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point.")

Here, the defendant has adequately exhausted administrative remedies because more than 30 days has passed between his daughter's original letter request to the BOP seeking compassionate release (received by the Warden of the FCC on April 10, 2020), and the filing of his present motion before the Court on May 13, 2020. Because that request set forth all relevant bases for relief raised in the defendant's present motion, there is no reason to consider

the defendant's successive, procedurally defective request from April 26, 2020. Nevertheless, for the reasons set forth below, DeSciscio's request for a reduction in sentence resulting in his immediate release should be denied on the merits.

B. The Defendant is Not Entitled to Compassionate Release as a Matter of Law under BOP Program Statement 5050.50.

In his first set of arguments, DeSciscio asserts that because he meets requirements set forth in BOP Program Statement 5050.50 (the "Program Statement"), "he is entitled to compassionate release as a matter of law." ECF No. 5, p. 7. First, he contends that he must be granted relief and released because he indisputably meets the criteria of Program Statement Section 4(a). That provision states:

> **"New Law" Elderly Inmates.** Inmates sentenced for an offense that occurred on or after November 1, 1987 (e.g., "new law"), who are age 70 years or older and have served 30 years or more of their term of imprisonment.

Program Statement, ¶ 4(a). An explanatory footnote continues that "[t]hese criteria are different from those provided in 18 U.S.C 3582(c)(1)(a)(ii) . . . ." *Id.* at n. 1.

Second, DeSciscio contends that he also meets the criteria of and is entitled to release under Program Statement Section 4(b). That provision states:

> **Elderly Inmates with Medical Conditions.** Inmates who fit the following criteria:
> ■ Age 65 and older.
> ■ Suffer from chronic or serious medical conditions related to the aging process.
> ■ Experiencing deteriorating mental or physical health that substantially diminishes their ability to function in a correctional facility.
> ■ Conventional treatment promises no substantial improvement to their mental or physical condition.
> ■ Have served at least 50% of their sentence.

Program Statement, ¶ 4(b).

As a threshold matter, as to both provisions, DeSciscio is simply mistaken that the BOP Program Statement grants him any legal entitlement to release. Compassionate release is now and has always been a discretionary form of relief, and nothing in the BOP Program Statement, or the Sentencing Commission's Policy Statement confers on DeSciscio any substantive right to release "as a matter of law." *See, e.g., Totaro v. Warden Fort Dix FCI*, 742 F. App'x 596, 598 (3d Cir. 2018) (not precedential) (pre-First Step Act, observing that the determination whether to seek/grant compassionate release is discretionary, and the Policy Statement does not confer any rights on the defendant). Instead, the Program Statement is merely a set of internal guidelines for the BOP to aid it in the exercise of its discretion in bringing motions for compassionate release.

Stated differently, as noted above, the statutory vehicle for DeSciscio's present motion is 18 U.S.C. § 3582(c)(1)(A). That statute provides the circumstances in which compassionate release *may* be granted.  18 U.S.C. § 3582(c)(1)(A)(i)-(ii) ("the court . . . *may* reduce the term of imprisonment . . ., after considering the factors set forth in section 3553(a) . . ., if it finds that— (i) extraordinary and compelling reasons warrant such a reduction; or  (ii)   the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g), and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.")

As noted above, Congress chose not to define "extraordinary and compelling reasons," and instead instructed the Sentencing Commission to do

12

so. That was done in the Policy Statement, more specifically, in the Application Notes to U.S.S.G. § 1B1.13. Application Note 1(D) (Subsection D), in turn provides that "extraordinary and compelling reasons exist [when] . . . [a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." Application Note 1(D) to U.S.S.G. § 1B1.13. The BOP, in turn, promulgated its own internal guidelines to aid it the exercise of its discretion in formulating other reasons under Subsection D, including the provisions now contained in the Program Statement.

Cognizant of this history, after the passage of the First Step Act, the Program Statement remains just what it has always been, internal guidelines *for the BOP* in the exercise of its discretion in making requests for compassionate release, including in determining what qualify as "extraordinary and compelling reasons" under Subsection D of the Policy Statement. In other words, Subsection D of the Policy Statement should continue to be applied as written. For a Court to find extraordinary reasons under Subsection D when considering a defendant's motion for compassionate release, there must still be a "determin[ation] by the Director of the Bureau of Prisons . . . in the defendant's case." Application Note 1(D) to U.S.S.G. § 1B1.13. Accordingly, the criteria set forth in the Program Statement, while certainly useful aids for the Court in the exercise of its discretion in considering a defendant's motion, are not binding on the Court and do not constitute a *prima facie* showing of extraordinary and compelling reasons for compassionate release under Subsection D in the absence of an independent determination by the BOP. It should be noted, however, that this issue is actively litigated. While some district courts have adopted the position of the United States, others have

found that the passage of the First Step Act has rendered Subsection D a "catchall" provision under which the Court may, without a determination from the BOP, identify other extraordinary and compelling reasons not enumerated elsewhere in the Policy Statement. *United States v. Michelle C. Cantatore*, No. 16-CR-0189 (ES), 2020 WL 2611536, at *3 (D.N.J. May 21, 2020) (identifying split in persuasive authority and collecting cases). The government's position, however, clearly is the most natural and plain reading of the statute and accompanying Policy Statement.

In the context of the present motion, however, the Court need not resolve this issue because DeSciscio is not "entitled" to relief under the Program Statement, even assuming its applicability here. By the terms of the Program Statement itself, Sections 4(a) and 4(b) provide circumstances in which, in the BOP's estimation, an inmate can make a threshold showing of extraordinary and compelling reasons for release, but that is not the end of the inquiry. Specifically, Program Statement Section 2, requires that any request for reduction in sentence ("RIS"), including those in the nature of compassionate release, must include a statement of "the extraordinary or compelling circumstances that the inmate believes warrant consideration." *Id.* Among others, Section 4 then provides that the "criteria for a RIS may include the following" and sets forth conditions including Sections 4(a) and 4(b). Section 4, however, also clearly states that "[a]ll RIS requests should be assessed using the factors outlined in Section 7." *Id.* Section 7, in turn, provides:

> For all RIS requests, the following factors should be considered:
> ■ Nature and circumstances of the inmate's offense.
> ■ Criminal history.
> ■ Comments from victims.
> ■ Unresolved detainers.

14

■ Supervised release violations.

■ Institutional adjustment.

■ Disciplinary infractions.

■ Personal history derived from the PSR.

■ Length of sentence and amount of time served. This factor is considered with respect to proximity to release date or Residential Reentry Center (RRC) or home confinement date.

■ Inmate's current age.

■ Inmate's age at the time of offense and sentencing.

■ Inmate's release plans (employment, medical, financial).

■ Whether release would minimize the severity of the offense.

When reviewing RIS requests, these factors are neither exclusive nor weighted. These factors should be considered to assess whether the RIS request presents particularly extraordinary and compelling circumstances.

Overall, for each RIS request, the BOP should consider whether the inmate's release would pose a danger to the safety of any other person or the community.

Accordingly, the Program Statement is clear that even by meeting all of the criteria set forth in Sections 4(a) or 4(b), an inmate is not thereby entitled to compassionate release. Those criteria are but the first step in a holistic inquiry, weighing numerous different considerations. Indeed, in its denial of DeSciscio's original request, the BOP indicated that it had engaged in just such a review. ECF No. 5-4 ("[a]fter a comprehensive review of Mr. DeSciscio's circumstances . . .").

Thus, although DeSciscio does meet all of the requirements of Program Statement Section 4(a) — he was sentenced for an offense committed after 1987, he is over 70 years old, and he has served more than 30 years of his sentence — the Court cannot now mechanistically determine that BOP erred as a matter of law in declining to seek compassionate release on DeSciscio's behalf, when a host of other factors impacted the BOP's decision to deny relief

under the Program Statement. This is even more straightforward in the case of Section 4(b), where the BOP was called upon first to determine whether a serious or chronic medical condition was causing a deterioration in the defendant's health before proceeding to weigh a multitude of other factors.

In short, the matter before the Court is a motion in a criminal case authorized by a statute, 18 U.S.C. § 3582(c)(1)(A). That statute is not an appropriate vehicle to seek effectively to compel the BOP to abide by its own internal guidelines (even though, as set forth above, DeSciscio demonstrably has not shown that the BOP failed to abide by those guidelines). As to DeSciscio's motion under Program Statement Section 4(a), there is no identical provision in Section 3582(c)(1)(A) or the Policy Statement. Section 3582(c)(1)(A)(ii) has requirements which overlap with Program Statement Section 4(a), in that they both require the defendant to be over 70, with 30 or more years of his sentence served. Section 3582(c)(1)(A)(ii) importantly differs from Section 4(a), however, in that it has the additional requirement that a defendant's sentence must have been imposed under 18 U.S.C. §3559(c), which DeSciscio's was not. Accordingly, DeSciscio cannot bring his purported Section 4(a) claim under Section 3582(c)(1)(A)(ii); it can only be brought, if at all, under Section 3582(c)(1)(A)(i). Section 3582(c)(1)(A)(i) and the Policy Statement do allow for motions attempting to demonstrate extraordinary and compelling reasons based on, among other things, age and years served, under Subsection B.

As to DeSciscio's motion under Program Statement Section 4(b), the language of the Program Statement closely tracks, but is not identical to, the language of Subsection B. Accordingly, DeSciscio's Section 4(b) argument, too, is best understood as a motion under Section 3582(c)(1)(A)(i), seeking to establish extraordinary reasons under the Policy Statement Subsection B.

16

Although the defendant has not couched this portion of his motion as arising under the applicable statutory provision and subsection of the Policy Statement, arguably waiving the claim, the United States will nevertheless respond to it below as if were so raised.

In all events, DeSciscio is flat wrong that he is entitled to immediate release—under the statute, Program Statement, or otherwise—"as a matter of law."

C.  The Defendant Does Not Warrant Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)(i) and U.S.S.G. § 1B1.13.

1.  Defendant Has Not Identified "Extraordinary and Compelling Reasons" for a Reduction in Sentence.

At the outset, Defendant's request for a reduction in sentence should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court may grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's Policy Statement defines "extraordinary and compelling reasons" to include the five categories listed above. Application Notes 1(A)-(D) to U.S.S.G. § 1B1.13.

Including the reframed version of his "entitlement as a matter of law" arguments above, DeSciscio raises, at most, three potential bases for establishing "extraordinary and compelling reasons" warranting release.[2]

First, under Subsection A(ii), DeSciscio contends that he is (i) suffering from serious medical conditions; (ii) that are chronic, *i.e.*, he is not expected to recover from them; and (iii) that substantially diminish his ability to provide self-care within the environment of a correctional facility due to the danger posed by the COVID-19 pandemic. ECF No. 5, p. 12.

Second, under Subsection B, DeSciscio contends that he (i) is at least 65 years old (78); (ii) is experiencing a serious deterioration in physical health because of the aging process (*i.e.*, his list of claimed medical conditions); and

---

[2] The precise bases of DeSciscio's request for relief are somewhat ambiguous. In Section Heading III of his moving brief, DeSciscio clearly recites the elements of a claim under Policy Statement Subsection A(ii). ECF No. 5, p. 12 ("MR. DESCISCIO'S MEDICAL CONDITIONS AND INABILITY TO PROTECT HIMSELF AGAINST INFECTION AND PROBABLE DEATH FROM COVID-19 CONSTITUTE EXTRAORDINARY AND COMPELLING REASONS FOR HIS COMPASSIONATE RELEASE."). In the body of his argument under that heading, however, DeSciscio claims to proceed under Subsection D, under the theory that the First Step Act has empowered the Court to find bases for "extraordinary and compelling reasons" not enumerated in Subsections A through C, and to do so without the input of the BOP. *Id.* at p. 13 ("While courts have noted that the Sentencing Commission's applicable policy statement in what constitutes 'extraordinary and compelling reasons,' other reasons may exist for granting compassionate release. See Note 1(A) § 1B1.13; Note 1(D), § 1B1.13 (recognizing that extraordinary and compelling reasons exist 'other than, or in combination with, the reasons described in subdivisions (A) through (C).'). Thus, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release.") DeSciscio appears to be arguing that under either Subsection A or D, the Court should find that DeSciscio's heightened risk from the COVID-19 pandemic alone should be sufficient to establish "extraordinary and compelling reasons." *Id.* at 15-16. The United States thus responds to DeSciscio's arguments under both Subsections A(ii) and D of the Policy Statement, as well as under Subsection B from his reframed arguments above.

(iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less (over 30 years). ECF No. 5, pp. 7-8.

Third, as discussed above, under Subsection D, DeSciscio appears to argue that the Court may craft a new basis for extraordinary and compelling reasons from the risk of COVID-19 to the defendant's health alone. *Id.* at pp. 15-16.

a) Policy Statement Subsection D

Addressing DeSciscio's Subsection D argument first, the law is clear that enhanced risk of hypothetical future infection due to the general presence of the COVID-19 pandemic is not, alone, sufficient to establish extraordinary and compelling circumstances. "Mere 'speculation concerning possible future conditions does not constitute a compelling reason for release.'" *Epstein*, 2020 WL 2537648, at *6 (quoting *United States v. Veras*, Crim. No. 19-010, 2020 WL 1675975, at *4 (M.D. Pa. Apr. 6, 2020)). In other words, the mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into any of the categories of the Policy Statement, which encompass only specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020);; *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of

the Sentencing Commission as required by § 3582(c)(1)(A).”).[3] To classify COVID-19 globally as an extraordinary and compelling reason for all inmates would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 protocols, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic. Accordingly, to the extent DeSciscio argues that his risk of infection, without satisfying the other requirements of Subsections A(ii) or B should be actionable under Subsection D, his position is inconsistent with the overwhelming weight of authority and should be rejected by the Court.

    b) <u>Subsections A(ii) and B</u>

    Turning to the heart of DeSciscio's motion, he seeks compassionate release on the basis of his advanced age (78), six medical conditions (prostate

---

[3] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) (“in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme.”); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

cancer, a heart condition for which he received a pacemaker, chronic sinusitis, kidney stones, vertigo, and hearing loss), and the danger posed by the COVID-19 pandemic given those conditions. Medical records received from the BOP support that DeSciscio is currently receiving treatment for at least one chronic condition that could be described as serious, namely prostate cancer and atrial fibrillation. *See* Ex. B, 35. Under Subsection A(ii), therefore, the key inquiry before the Court is whether these medical conditions "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility." Application Note 1(A)(ii) to U.S.S.G. § 1B1.3. In making such a determination in the context of the COVID-19 pandemic, the United States and the Courts look to the guidance of the Centers for Disease Control and Prevention ("CDC"). The CDC has assembled a list of medical conditions rendering individuals at higher risk from the COVID-19 pandemic. That list includes:

- Asthma (moderate to severe);

- Chronic kidney disease being treated with dialysis;

- Chronic lung disease, such as chronic obstructive pulmonary disease (COPD) (including emphysema and chronic bronchitis), idiopathic pulmonary fibrosis, and cystic fibrosis;

- Diabetes, including type 1, type 2, or gestational;

- Hemoglobin disorders, such as sickle cell disease and thalassemia;

- Immunocompromised, including from cancer treatment, bone marrow or organ transplantation, immune deficiencies, HIV with a low CD4 cell count or not on HIV treatment, and prolonged use of corticosteroids and other immune weakening medications;

- Liver disease, including cirrhosis;

- Serious heart conditions, including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension; and

- Severe obesity, defined as a body mass index (BMI) of 40 or above.

21

*See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The CDC also lists being 65 years old or older as a heightened risk factor, but, in the context of compassionate release, that factor alone is insufficient to establish "extraordinary and compelling reasons" as it is the subject of its own guideline in Subsection B.

Looking, then, to Subsection B, it is undisputed that the defendant is over 65 years old, and that he has served more than 10 years of his sentence. The key remaining inquiry before the Court under this Subsection is whether DeSciscio "is experiencing a serious deterioration in physical or mental health because of the aging process."

The answer to the Court's remaining inquiries under both Subsections A(ii) and B is found in DeSciscio's medical records, which show that although DeSciscio has multiple serious medical conditions, some of which as a matter of general knowledge are associated with advanced age, none are equivalent to the categories flagged by the CDC, and all are currently either well-controlled by treatment or not documented as presenting severe current symptoms. Accordingly, DeSciscio is neither suffering from a substantially diminished ability to care for himself during the pandemic, nor experiencing a serious deterioration in his health.

Specifically, Defendant's motion is based on six alleged health conditions, of which, at least the first two can be considered serious: (1) prostate cancer, (2) a heart condition for which he received a pacemaker, (3) chronic sinusitis, (4) kidney stones, (5) vertigo, and (6) hearing loss. The defendant's medical records confirm that he currently has:

(1) Prostate Cancer, diagnosed in October 2014, Ex. B, p. 48;

(2) Atrial Fibrillation (a heart condition), most recently diagnosed in October 2018, with the presence of a cardiac pacemaker as part of his treatment since October 2017, *id.* at 48-49;

(3) Chronic Rhinitis, diagnosed in March 2017 (the records do not reflect a current or past sinusitis diagnosis), *id.* at 48;

(4) Uric Acid Nephrolithiasis (bladder/kidney stones), diagnosed in March 2014, and resolved by May 2015, *id.* at 48-49;

(5) Benign Paroxysmal Positional Vertigo, first diagnosed in September 2010, resolving shortly thereafter, returning in February 2012, resolving again in May 2016, returning again in March 2020, *id.* at 48; and

(6) Unspecified Hearing Loss, diagnosed in May 2016, *id.* at 48.

Looking at each of these conditions in turn, DeSciscio's prostate cancer does not constitute an extraordinary and compelling reason for release, even in the context of the COVID-19 pandemic. In DeSciscio's most recent Chronic Care – Advanced Practice Provider Follow Up appointment on March 2, 2020, the treating certified physician's assistant recorded that DeSciscio's prostate cancer was being treated with Tamsulosin, and that DeSciscio "denie[d] any urinary issues" associated with his prostate cancer diagnosis. *Id.* at 3. There is no indication in the records of DeSciscio being immunocompromised as the result of his cancer treatment or of any other complaints of serious symptoms associated with his cancer diagnosis or treatment.

The CDC recognizes atrial fibrillation, like that with which DeSciscio has been diagnosed, as a heart condition, defining it as set forth below:

Atrial fibrillation, often called AFib or AF, is the most common type of treated heart arrhythmia. An arrhythmia is when the heart beats too slowly, too fast, or in an irregular way.

When a person has AFib, the normal beating in the upper chambers of the heart (the two atria) is irregular, and blood doesn't flow as well as it should from the atria to the lower chambers of the heart (the two ventricles). AFib may happen in brief episodes, or it may be a permanent condition.

https://www.cdc.gov/heartdisease/atrial_fibrillation.htm. As noted above, however, it declined, in its guidance concerning COVID-19 to include atrial fibrillation in its list of serious heart conditions exposing patients to heightened risk from the virus. The National Institutes of Health, National Heart, Lung, and Blood Institute, recognizes the implantation of a pacemaker as an appropriate treatment for atrial fibrillation in some circumstances. *See* https://www.nhlbi.nih.gov/health-topics/atrial-fibrillation. In DeSciscio's most recent Chronic Care – Advanced Practice Provider Follow Up appointment on March 2, 2020, the treating certified physician's assistant recorded that DeSciscio's atrial fibrillation was currently being treated with aspirin and a pacemaker and that DeSciscio "denie[d] any chest pain or SOB [shortness of breath]. Indicate[d] he is feeling ok." *Id.* at 3. Additionally, on March 23, 2020, a treating certified physician's assistant recorded than an electrocardiogram ("EKG") was completed on DeSciscio, showing no signs of pathology. *Id.* at 2. In the absence of any medical evidence from DeSciscio establishing otherwise, it is clear that he has not met his burden to show that this chronic condition, under treatment, rises to the level of an extraordinary and compelling reason for release.

There is no indication in DeSciscio's records of a diagnosis of chronic sinusitis. DeSciscio does have a diagnosis for rhinitis, which is a condition affecting the nasal passageways, part of the upper respiratory system, the symptoms for which can include a runny nose, sneezing, and nasal stuffiness. It is frequently caused by seasonal allergies or the common cold. *See* https://medlineplus.gov/ency/article/001648.htm; https://medlineplus.gov/ency/article/000813.htm. Other than the fact of his diagnosis in March 2017, and his using over the counter nasal spray in January 2017, Ex. B, 55, however, it does not appear that DeSciscio has

reported any symptoms associated with this condition. Additionally, when DeSciscio was evaluated after having chest pains on October 8, 2019, the treating registered nurse reported that a cardiac computed tomographic angiography ("CTA") exam of the anterior, lateral, and posterior fields of DeSciscio's lungs was conducted, with the findings that "[a]irway patent, breathing non-labored and regular." Ex. B, 22. The term patent in this context means free from obstruction or blockage. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3273374/. At that time, DeSciscio reported that he was no longer having any episodes of pain and that the pain had not been exacerbated by deep breathing. *Id.* at 22. This is consistent with his September 10, 2019, Chronic Care – Chronic Care Clinic exam, in which the examining doctor of osteopathic medicine recorded no problems with DeSciscio's respiratory system, including no reports of cough or shortness of breath. *Id.* at 33. Accordingly, nothing in DeSciscio's rhinitis diagnosis rises to the level of a chronic lung disease or asthma, as set forth in the CDC's guidance.

Although DeSciscio's records indicate that he had kidney stones in the past, they also reflect that the condition resolved over five years ago. *Id.* at 48-49. Even were it an active diagnosis, however, kidney stones do not rise to the level of "chronic kidney disease being treated with dialysis" as set forth in the CDC guidance.

The defendant's most recent bout of benign positional vertigo occurred on March 23, 2020. According to his medical records, it arose after he did not eat breakfast or lunch, and had had little to drink. He reported feeling much better after being treated. At that time he "denied[d] any mobility problems and ha[d] no history of falls less than 3 months, does not use an Ambulatory Aid, has normal gait, and is oriented to his own abilities." *Id.* at 2. The defendant's

treatment plan was simply to eat breakfast and drink water regularly. *Id.* Feeling faint from lack of food and dehydration is clearly not the type of ailment contemplated as providing a basis for compassionate release.

Finally, although DeSciscio's medical records reflect a diagnosis of hearing loss, there is no indication of either recent complaints or treatment related to this diagnosis. The records do show, however, that in the context of other treatment, DeSciscio has been interviewed by medical professionals and had provided oral responses to questions, most recently in March 2020. *See, e.g.*, 1-2. This ailment is also clearly not of a type that would increase the Defendant's susceptibility to the COVID-19 pandemic. To the extent DeSciscio relies on this condition as a serious deterioration in this physical and mental health due to the aging process under Subsection B, he has plainly failed to meet his burden of proof, as neither his account of requesting a hearing aid nor the dearth of evidence in his medical records provides sufficient documentation of a condition of the requisite severity. Although the United States understands the defendant's desire for a hearing aid, in the absence of evidence of such severity, the defendant's request is more akin to a complaint for optimal care, which courts routinely reject on the grounds that the law guarantees only adequate medical care while incarcerated. *Epstein*, 2020 WL 2537648, at *5.

Accordingly, at the present time, it is apparent that, but for the COVID-19 pandemic, Defendant would present absolutely no basis for compassionate release. His medical ailments are well-controlled and do not present any impediment to his ability to provide self-care within FCI Allenwood Medium. The existence of the COVID-19 pandemic should not alter this analysis not only because his conditions are not of the type or severity to give rise to heightened risk from COVID-19 as discussed above, but also because of the

significant steps being taken by his facility to contain and prevent the spread of the virus.

As noted above, staff and inmates of FCI Allenwood Medium have been issued appropriate PPE including face coverings and public areas of the facility are regularly disinfected. Moreover, contrary to the defendant's general assertion that there are reports of inadequate supplies in prisons generally, at present, FCI Allenwood Medium has adequate supplies of PPE, including masks, gloves, soap, and hand sanitizer, to meet the needs of inmates and staff. Ex. A, ¶ 18. Measures have heretofore been effective, with only one case among the staff back in March and no COVID-19 cases among the inmate population. *Id.* at ¶ 19.

In such circumstances, and for the reasons above, DeSciscio has failed to establish any "extraordinary and compelling reason" for a reduction under § 3582(c)(1)(A). His motion should be denied. *See, e.g., United States v. Rodriguez-Orejuela*, No. 03-CR-20774, 2020 WL 2050434, at *5 (S.D. Fla. Apr. 28, 2020) (despite the defendant "suffering from a 'lengthy laundry list' of problems, including: metastatic colon cancer . . ., metastatic prostate cancer, chronic gastrointestinal disorder, chronic stricture and stenosis of esophagus, . . . chronic diaphranatic hernia, two heart attacks (the latter requiring a pacemaker), chronic coronary artery disease, chronic hypertension, chronic dysphagia, chronic anxiety and depression, hyperlipemia, gout, hyperplasia, acute chronic sinusitis, acute periodontitis, psoriasis, and skin cancer . . . [a]fter carefully reviewing the relevant medical records, the Court finds that, although the records are extensive, [defendant] is not suffering from the kind of physical or medical condition required by statute to merit a reduction in sentence.")

2.  The § 3553(A) Factors Weigh Against the Defendant's Release.

Because DeSciscio has failed to show an extraordinary and compelling reason for reduction in his sentence, the Court need not continue its analysis any further before denying his motion. But even were the Court to find that DeSciscio has made the necessary threshold showing of "extraordinary and compelling reasons," a reduction in sentence resulting in his release would nevertheless be entirely unwarranted given the weight of the Section 3553(a) factors.

Under the applicable Policy Statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

The United States acknowledges that, due to his advanced age, the danger the defendant would pose to public safety if released is reduced, but, due to his placement in La Casa Nostra and the nature of his crimes, some potential for danger remains. *See, e.g., Epstein*, 2020 WL 2537648, at *3 (citing U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 30 (2017), available at https://www.ussc.gov/sites/[s]default/files/pdf/research-and-publications/research-publications/2017.20171207_Recidivism-Age.pdf)

Other factors, however, militate overwhelmingly against any reduction in sentence. First and foremost, the defendant's violent and egregious conduct in the offenses of conviction, including acting as an enforcer in an illegal gambling operation, participating in multiple conspiracies to commit *murder*, and being on scene to assist in the commission of an actual *murder*, weighs against any

28

reduction. 18 U.S.C. § 3553(a)(1). Second, although 75 years is certainly a very substantial sentence, with conduct so egregious there is a real need to maintain the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *Id.* at § (a)(2)(A). The RICO statute under which DeSciscio was convicted by design carries enhanced penalties to deal with the uniquely deleterious effects on society of organized crime. The Supreme Court observed as much in one of the key cases interpreting the law:

> The statement of findings that prefaces the Organized Crime Control Act of 1970 reveals the pervasiveness of the problem that Congress was addressing by this enactment:
>
> "The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; . . . ." 84 Stat. 922–923.
>
> In light of the above findings, it was the declared purpose of Congress "to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, *by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies* to deal with the unlawful activities of those engaged in organized crime." *Id.*, at 923.

*United States v. Turkette*, 452 U.S. 576, 588–89 (1981) (emphasis added).

Congress thus stressed the seriousness of offenses like DeSciscio's, which "corrupt legitimate business," "subvert . . . our democratic processes," "weaken the stability of the Nation's economic system, [and] undermine the

general welfare of the Nation and its citizens." *Id.* at 588. Congress also explicitly found "enhanced sanctions" necessary to achieve its purposes in eradicating such crime. *Id.* at 589. Thus, to grant compassionate release in cases like the one before the Court, where the thrust of the defendant's argument is primarily based on the length of his time served and the collateral effects thereof, would frustrate the manifest intent of Congress in passing the RICO laws to impose such severe punishments. Requiring RICO defendants, including the defendant, to serve the sentences imposed promotes respect for the law, encourages general deterrence of conduct that Congress has identified as uniquely harmful, and ensures just punishment for such offenses consistent with Congress's intent.

Accordingly, in light of Defendant's violent and extortionate offense conduct, his enforcer role within La Casa Nostra, and the totality of relevant circumstances, this Court should deny the motion for a reduction in sentence.[4] Consideration of the relevant § 3553(a) factors certainly does not warrant slashing the defendant's sentence by some 32 years (the amount of time he has remaining to serve).

---

[4] On page 15 of his motion, DeSciscio makes arguments under the Eighth Amendment to the United States Constitution concerning alleged deliberate indifference to his medical needs. Such arguments are properly raised, if at all, as challenges to conditions of confinement under 28 U.S.C. § 2241 in the district of incarceration. As the defendant is incarcerated in the Middle District of Pennsylvania, this Court has no jurisdiction over the defendant's Eighth Amendment claim, to the extent he intended to raise it, and it should be dismissed without prejudice. *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) ("Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement.") (citations omitted).

## CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Defendant's motion for a reduction in sentence and compassionate release should be denied.[5]

Respectfully submitted,

CRAIG CARPENITO
UNITED STATES ATTORNEY

By:    *s/ Alexander E. Ramey*

ALEXANDER E. RAMEY
ASSISTANT UNITED STATES ATTORNEY

---

[5] Although, for the reasons set forth above, the defendant's motion should be denied, were the Court to grant release, the Government would request that the defendant be isolated and detained for at least a 14-day quarantine period, with a requirement for clearance by BOP medical staff prior to release to minimize the possibility of any spread of COVID-19 from the inmate to the public.