UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

|   |   |   |
|---|---|---|
| | : | Criminal Case No. CR-88-239 (MTB) |
| UNITED STATES OF AMERICA | : | |
| | : | **MEMORANDUM IN SUPPORT OF WRIT OF** |
| v. | : | **HEABEAS CORPUS FOR MULTIPLE** |
| | : | **CONSTITUTIONAL VIOLATIONS AND** |
| RICHARD DESCISCIO | : | **SECOND REQUEST FOR RELIEF** |
| | : | **PURSUANT TO 18 U.S.C. § 3582** |

_____

### EXECUTIVE SUMMARY

Richard DeSciscio was denied due process of law, as the United States Government actively concealed exculpatory evidence available to them at the time of trial in a successful effort to unjustly incarcerate DeSciscio, and now moves this Court pursuant to 28 U.S.C. § 2241 and 18 U.S.C. §3582. Certain evidence that was later disclosed by the Government provides demonstrative proof that the Government would go to great lengths to improperly incarcerate DeSciscio, by continuously misleading this Court and concealing evidence of DeSciscio's innocence, which included, *inter alia*:

- At trial the Government presented to the jury, as evidence supporting the charge of murder, recorded voices which they attributed to individuals which were known to the Government contemporaneously to be definitively not present at the time of the recording;

- The Government submitted, in the form of audio transcripts, doctored evidence to the jury despite having the "best evidence" as well as corroborating evidence demonstrating that what they purported to the jury was not what occurred on August 5, 1988;

- The Government concealed, at trial and then after, thousands of pages of exculpatory evidence, of which only subsequently were some *erroneously and carelessly* turned over by the Government, via diligent and continuous FOIA requests;

1

- The Government, at trial and then after, failed to produce a "pen-registry" proffering demonstrative evidence that Defendants were not part of the alleged gambling ring – which was only charged to assure Defendants would never be eligible for parole, pursuant to the new laws enacted at that time; and

- The Government manipulated the identification process, by employing unconstitutional witness identification methods and purposefully withholding prior witness statements and memorandum, so that Defense counsel could not effectively challenge and discredit the Government's only witness tying their case together.

## RELEVANT STATUTES

### *28 U.S.C. § 2241(a)(c)(3)*

A writ of habeas corpus may be granted by the district courts within their respective jurisdictions, but may not be extended to a prisoner unless he is in custody in violation of the Constitution or the laws or treaties of the United States.

### *18 U.S.C. § 3582(c)(1)(A)(i)*

Generally, a court may not modify a term of imprisonment once it has been imposed. However, upon motion by a defendant after exhausting all administrative remedies, a court may reduce the term of imprisonment after considering the applicable factors set forth in 18 U.S.C. 3553(a) if it finds that extraordinary and compelling reasons warrant such a reduction, and that such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission.

## INTRODUCTION

Representatives of the Department of Justice violated their oath of office when they knowingly misrepresented material facts to the court, as said representatives concealed and mislead multiple judges into pursuing the herein action against DeSciscio.

Ignorance of the existence of any exculpatory material by anyone acting on behalf of the Government, including investigators, does not alleviate the Governments obligations under

2

*Brady*.  "To comply with *Brady*, prosecutors must learn of any favorable evidence known to others acting on the Government's behalf… including police." *See Dennis v. Secretary, Pennsylvania Dept. of Corr.*, 834 F.3d 263, 284 (3d Cir. 2016) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995))).

The evidence provided shows that DeSciscio's conviction, predicated on falsely interpreted tapes could have been avoided, but for the Government's win at any cost position. Today, more than 30 years later, we respectfully ask this court to have the Government affirmatively answer for their wrongs, which caused this miscarriage of justice.[1]

"[A] prosecutor's violation of the obligation to disclose favorable evidence accounts for more miscarriages of justice than any other type of malpractice, but is rarely sanctioned by courts, and almost never by disciplinary bodies." Elizabeth Napier Dewar, *A Fair Trial Remedy for Brady Violations*, 115 Yale L.J. 1450, 1454 (2006). The very nature of *Brady* violations – that evidence was suppressed – means that defendants learn of violations in their cases only fortuitously, when the evidence surfaces through an alternate channel.[2]

We respectfully ask this Court to review the facts contained herein, and grant relief to DeSciscio, as he has been incarcerated due to clear prosecutorial misconduct, which has caused a substantial miscarriage of justice, that only this Court can correct.

---

[1] Nearly eight years prior to the instant prosecution, where the United States offered to purchase false testimony for $150,000 from John Torre as well as unlawfully held DeSciscio's co-defendant Manna in contempt for five years.

[2] A recent empirical study of all 5,760 capital convictions in the United States from 1973 to 1995 found that prosecutorial suppressions of evidence accounted for 16% of reversals at the state post conviction stage. A study of 1,000 cases involving prosecutorial misconduct in the years since the *Brady* decision identified 381 homicide convictions that were vacated "because prosecutors hid evidence or allowed witnesses to lie." This study's author's note, however, that their findings represent "only a fraction" of the amount of serious misconduct, because so much misconduct is undetected.

3

## Procedural History & Facts

DeSciscio was indicted and convicted subsequent to a jury trial in the United States District Court for the District of New Jersey. Found guilty, he was sentenced to 75 years of imprisonment. The Court of Appeals for the Third Circuit affirmed his conviction; subsequent motions under 28 U.S.C. § 2244 for leave to file a second or successive § 2255 petition to vacate his sentence were denied; and his motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) was denied.

Despite his conviction and the denial of his motions, throughout the years, DeSciscio has always maintained his innocence and now, only through diligent work, and an admitted error of the custodian of records, has DeSciscio come into possession of exculpatory evidence, which dispositively proves that the Government concealed said exculpatory evidence, lied, and perjured themselves to ensure DeSciscio's conviction.[3]

The case against DeSciscio was centered on certain audio surveillance; specifically, tapes of conversation said to take place on August 5, 1987. At trial, the Government submitted to the jury, a fictional version of this conversation, which, based on their own video evidence, investigational logs, witnesses, and special agents, definitively could not have transpired as presented. The Government's fabrication coupled with the intentional withholding of relevant information was a calculated move to ensure the Government ill-gotten success. It is crucial to note that the Government's devious plot to convict DeSciscio only came to light years later, *subsequent an administrative error*, *when an agent of the Government supplied DeSciscio with certain exculpatory evidence, which was hidden from him for years*. This, in and of itself must allow for this Honorable Court to determine that DeSciscio was in fact denied due process of law and that a fundamental miscarriage of justice occurred.

---

[3] Memorandum of August 20, 1987 and April 17, 1989

It is important to note that, ***the Government's own evidence*** exonerates DeSciscio of any wrongdoing, as it pertains to the allegations set forth within indictment No. 88-CR-239, most importantly as it relates to the alleged murder of Irwin Schiff and the gambling charges.

During trial, the presiding judge stated that this was in fact a "tape case." Utilizing that prelude, all information relating to any and all tapes in possession of the Government should have been provided to the Defense, which it clearly was not, as proven years later via multiple FOIA disclosures[4]. In light of the aforementioned, and as the evidence undoubtedly proves, DeSciscio's conviction was manufactured, and a clear violation of any and all constitutional safeguards as enumerated herein, including a violation of both due process of law and *Brady*.

## FRAUD UPON THE COURT

The role of a prosecutor is to see that justice is done. *Berger v. United States*, 295 U.S. 78, 88 (1935). "It is as much [a prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Connick v. Thompson*, 563 U.S. 51, 71 2011). If evidence highly probative of innocence is in a prosecutor's file, he should be presumed to recognize its significance even if he has actually overlooked it. *Giglio* v. *United States,* 405 U.S. 150, 154 (1972). Here, the Government and its agents <u>possessed</u> certain facts which they purposefully failed to disclose, including, but not limited to, the fact that the August 5, 1987 conversation had nothing to do with Irwin Schiff, let alone a plot to murder Schiff, beginning with certain interception logs authored in real time by investigating Agent Dinsmore, whereby, he clearly memorializes the sum and substance of the conversation, relating to "***<u>weekend union shifts</u>***," not the fabricated alleged allegations of "Irwin Schiff."

---

[4] Despite receiving voluminous records, it is upon information and belief that there is nearly 15,000 pages which have yet to be turned over.

In addition, the Government had a plethora of information that the individuals that they alleged were participants in the conversation, left the location prior to the recording commencing.  The aforesaid only came to light subsequent the trial, at which the Government implemented a win at any cost tactic.

The Government made bold assertions, **which they knew were patently false**. The Government asserted that Martin Casella was a speaker on the August 5, 1987 audio recording and supported these assertions with fabricated context of the conversation, and published those lies to the jury, by providing manufactured transcripts – which clearly violated the best evidence rule.[5] As previously mentioned, FOIA requests revealed an interception log, prepared by Agent Robert Dinsmore (NKDJNJ NO. 577 Reel No.1 Page 6 of August 5, 1987), which clearly states that individuals, but *not* Martin Casella, were engaged in a conversation regarding early and weekend "union shifts," not Irwin Schiff, and nothing to do with murders, as wrongfully depicted in the transcripts. **Exhibit A – Interception Log.** In addition to the aforementioned, the Government was also in possession of key information regarding certain individuals whom they knew were present, via a license plate investigation, which at the time of trial the Government affirmatively stated they did not have; thus, again misleading this Honorable Court.

As more fully briefed below, the Government lied to Judge Ackerman when they sought the extension of the electronic surveillance, as in Special Agent John P. Mullaney's ("Mullaney") August 18, 1987 affidavit pertinent evidence was intentionally omitted, only to further the Government's ill agenda and convict DeSciscio pursuant to the newly utilized RICO laws. Stated differently, Attorney Beardell and Mullaney fraudulently induced the court to further the surveillance, stating that it was going to be the only way the Government would be

---

[5] The elementary wisdom of the **best evidence rule** rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description and this is no less true as to the extent and circumstances of a contradiction. *Gordon v United States*, 344 U.S. 414, 421 (1953).

successful, despite Mullaney's knowledge that Agent Forster had control over a confidential informant, Peter Caporino, of which until today, certain 302's have yet to be produced.

Moreover, and as explained in more detail herein, Agent Foster, who attempted to connect the defendants named herein to the voices of the August 5, 1987 recording, was not investigating defendants, but had failed to successfully indict and prosecute them years before. Thus, it is clear, that Foster's testimony was erroneous, perjurious, and only elicited to avenge his previous failure to indict the defendants.

Succinctly stated, the Government fraudulently purported, to this Honorable Court, that the August 5, 1987 conversation was related to the murder of Irwin Schiff[6], when in fact they knew it was not, only to inflame both the Court and the jury's perception of DeSciscio and his co-defendants. In addition to the Government's contradictory evidence, which was withheld at trial, DeSciscio's co-defendant, Manna, engaged Joel Charles to analyze the August 5, 1987 audio, and he also dispositively found that the verbiage was "shift" and not "Schiff." **Exhibit B – Joel Charles Affidavit, ¶ 26 -30.**

The Government entered into a conspiracy individually and collectively in light of Agent Robert Stewart's submission that he only had approval for audio surveillance and that in a RICO case, all such approval must come from the Washington Hierarchy, including the Washington Chief of Organized Crime and Racketeering Supervisor. Although the Government's Title III authorization was limited to audio surveillance, the Government abused their authority and implemented video surveillance as well. This ill-gotten video evidence, however, undisputedly records Martin Casella as he leaves Casella's restaurant prior to the August 5, 1987 recording. Again, the Government conveniently failed to proffer this exculpatory video at trial and failed to disclose it to the defense prior to trial. The fact that Casella was not a party to the conversation

---

[6] More than 30 years later, the 19th precinct (New York) continues to have an open case

dispositively shows that the Government's rendition of the facts presented at trial was patently false. **Exhibit C – Video Log.**

To further support DeSciscio's assertion of innocence, surveillance agents recorded license plate numbers of vehicles outside Casella's. Said plates returned as registered to Thomas Smith, and also lead to the identification of Joe Petrizzo.[7] The existence of these license plate queries and their results was denied at the time of trial (Trial Transcript at 2327). However, this information, if disclosed to defense counsel, would have inevitably led to Smith and Petrizzo's testimony, consistent with the investigatory 302 report, stating in sum and substance that he did not know DeSciscio, but did speak to individuals in Casella's "several times about getting jobs at the union for Smith's friends." **Exhibit D – Smith 302.** The aforesaid is consistent with the reenactment of November 16, 1999, wherein the following statements were made: Mr. Petrizzo: "[T]hey changed his shift. They're making him work Saturday and Sunday steady…Can't do nothing about it. That's the shift. Mr. Smith: You know what they're saying….[8]

In addition to the aforesaid, more than one investigating agent, including Agent Wells, made sworn affidavits that the voices on the recording could not be attributed to any one individual. However, without any voice identification techniques available at the time, an unsupported, arbitrary, bias incorrect conclusion was drawn, only to serve the Government's ill interests.

Lastly, Judge Maryanne Trump Barry stated that she personally reviewed "8 boxes" and that there was no *Brady* material that could help the defendants. (Trial Transcript at 5249 -5250). Thereafter, Judge Barry ordered that the Government did not have to turn over certain 302's; specifically, that the "interest of justice does not require it, to the defense attorney…" (Trial

---

[7] Smith and Patrizzo confirmed being interviewed and confirmed their voices on the August 5, 1987 recording.
[8] Joel Charles opined in his professional opinion that the word mentioned was "shift" not "Schiff" (*See* **Exhibit C**)

Transcript at 2267). Despite the assertions that there was no relevant defense material within the 8 boxes, years later, via persistent FOIA requests, DeSciscio learned that certain exculpatory evidence then released to him was extracted from the 8 boxes.

## ACTUAL INNOCENCE

[I]f a petitioner…presents evidence of his actual innocence so strong that a court cannot have confidence in the outcome of the trial unless the Court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claim. *Schlup v. Delo*, 513 U.S. 298 (1995).

In *McQuiggin v. Perkins*, the U.S. Supreme Court held that "actual innocence," if proved, is a gateway through which a habeas petitioner can make it into federal court even though the AEDPA statute of limitations has run. 569 U.S. 383 (2013).

To satisfy the gateway actual innocence standard, first, a petitioner must present new, reliable evidence and second, show by a preponderance of the evidence that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence, or, stated differently, that it is more likely than not any reasonable juror would have reasonable doubt. As part of the reliability assessment of the first step, the court may consider how the timing of the petitioner's submission and the likely credibility of the witnesses bear on the probable reliability of that evidence, as well as the circumstances surrounding the evidence and any supporting corroboration. *Id*.

In evaluating the second step—whether it is more likely than not no reasonable juror would convict the petitioner—the court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538

(2006) (internal quotation marks and citations omitted). "[M]ere impeachment evidence is generally not sufficient to satisfy the [actual innocence gateway] standard." *Munchinski v. Wilson*, 694 F.3d 308, 338 (3d Cir. 2012). However, new, reliable evidence that "undermine[s] the [trial] evidence pointing to the identity of the [perpetrator] and the motive for the [crime]" can suffice to show actual innocence. *Goldblum v. Klem*, 510 F.3d 204, 233 (3d Cir. 2007); *see also Munchinski*, 694 F.3d at 336-37 (explaining that actual innocence was demonstrated where new evidence both showed that the crime could not have happened in the way the Commonwealth presented at trial and provided an alternative theory that was more appropriate and better fit the facts of the case). In weighing the evidence, "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors"; the actual innocence standard "does not require absolute certainty about the petitioner's guilt or innocence." *House,* 547 U.S. at 538.

The gateway actual innocence standard is "demanding" and satisfied only in the "rare" and "extraordinary" case where "a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." *McQuiggin*, 569 U.S. at 386, 392, 401. Those courts that define "new evidence" to include evidence not presented at trial find support in *Schlup*. In announcing the standard for a gateway actual innocence claim, the *Schlup* Court stated that a federal habeas court, after being presented with new, reliable exculpatory evidence, must then weigh "all of the evidence, including . . . evidence tenably claimed to have been wrongly excluded or to have become available only after the trial" to determine whether no reasonable juror would have found the petitioner guilty. 513 U.S. at 327-28. The reference to "wrongly excluded" evidence suggests that the assessment of an actual innocence claim is not intended to be strictly limited to newly discovered evidence— at least not in the context of reaching an

10

ineffective assistance of counsel claim based on counsel's failure to investigate or present at trial such exculpatory evidence, as was the case in *Schlup*. In addition, in articulating the new, reliable evidence requirement, the Supreme Court stated that the petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324.

Moreover, the Court used the phrase "newly presented evidence" in the context of discussing witness credibility assessments that may occur as part of the actual innocence gateway analysis. *Id.* at 330. When considered in the context of the Court's other statement about weighing all evidence—including not only evidence unavailable at trial but also evidence excluded at trial—these references to evidence not presented at trial further suggest that new evidence, solely where counsel was ineffective for failing to discover or use such evidence, requires only that the evidence not be presented to the factfinder at trial. *See Schlup*. Indeed, among the new evidence presented by the petitioner in *Schlup* was an affidavit containing witness statements that were available at trial. *See Id.* at 310 n.21. However, the Supreme Court did not discuss the significance of the evidence's availability, nor reject the evidence outright, which presumably it would have done if the actual innocence gateway was strictly limited to newly discovered evidence.

*Schlup*, therefore, strongly suggests that new evidence in the actual innocence context refers to newly presented exculpatory evidence. Indeed, in a subsequent decision, the Supreme Court cited *Schlup* for this very proposition, stating that "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324). "Failure to present [such] evidence, a requirement that the new evidence be unknown to the defense at the time of

trial would operate as a roadblock to the actual innocence gateway." *Gomez v. Jaimet*, 350 F.3d 673, 679-80 (7th Cir. 2003). To overcome this roadblock, the court held that when a petitioner asserts ineffective assistance of counsel based on counsel's failure to discover or present to the factfinder the very exculpatory evidence that demonstrates his actual innocence, such evidence constitutes new evidence for purposes of the *Schlup* actual innocence gateway. *Id*. at 681.

This approach is consistent with *Schlup* and the rulings of many of our sister circuits. Moreover, it recognizes that "the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system." *Schlup*, 513 U.S. at 325. Indeed, "the conviction of an innocent person [is] perhaps the most grievous mistake our judicial system can commit," and thus, the contours of the actual innocence gateway must be determined with consideration for correcting "such an affront to liberty." *Satterfield v. Dist. Att'y Phila.,* 872 F.3d 152, 154 (3d Cir. 2017).  The limited approach we adopt to evaluate new evidence to support an actual innocence gateway claim, where that claim is made in pursuit of an underlying claim of ineffective assistance of counsel: (1) ensures that reliable, compelling evidence of innocence will not be rejected on the basis that it should have been discovered or presented by counsel when the very constitutional violation asserted is that counsel failed to take appropriate actions with respect to that specific evidence; and (2) is consistent with the Supreme Court's command that a petitioner will pass through the actual innocence gateway only in rare and extraordinary cases. *Schlup,* 513 U.S. at 324; *Reeves v. Fayette SCI*, 897 F.3d 154, 164 (3d Cir. 2018).

The Courts have unanimously acknowledged that a showing of actual innocence that has led to a fundamental miscarriage of justice is a viable pathway through the gate keeping provision of the AEDPA. "[A]ctual innocence constitutes an equitable exception to the statue of limitations set forth in 28 U.S.C. 2244(6). *Jones v. Warden Lewisburg USP*, 621 F.App'x 103, 105 (3rd Cir. 2015), citing *McQuiggin*, 569 U.S. at 391-93. "A claim for actual innocence, if

proved, is not itself a constitutional claim, but instead a gateway through which a habeas

petitioner must pass to have his otherwise barred constitutional claim considered on the merits."

*Schlup*, 513 U.S. at 315; *see also McClesky v. Zant*, 499 U.S. 467, 494-95 (1991)("[T]he failure

to raise the claim in an earlier petition may nonetheless be excused if he or she can show that a

fundamental miscarriage of justice would result from a failure to entertain the claim.").

     The evidence attached hereto is material, and if properly exchanged with Defense counsel

at the time of trial, would have changed the outcome.  DeSciscio, an innocent man, wrongfully

convicted, has been penalized for failing to timely bring a claim that was only delayed due to the

Government's own violations.  It is the Government's own evidence presented herein which now

calls for DeSciscio's immediate release.

## VOICE RECOGNITION

     The Government knew that neither DeSciscio, nor Manna, nor Casella were participants

in the August 5, 1987 conversation. Despite being armed with the aforesaid knowledge, Agent

Mullaney, in his affidavit of August 18, 1988, intentionally mislead the court to further the

government's ill motive.

     As previously stated, supporting evidence clearly establishes that neither DeSciscio, nor

Manna, nor Casella were engaged in the August 5, 1988 conversation. Years thereafter, Manna,

on his own accord, hired Joel Charles who found that the speakers included Rocco Napoli,

Dennis Roman, Thomas Smith[9] and a waiter with a heavy accent. **Exhibit B- Affidavit of Joel**

**Charles.**

     Investigating federal agent, Special Agent Drizella Wells, stated that she could not

identify and was not familiar with the voices of the August 5, 1987 recording. Specifically, she

---

[9] Thomas Smith signed a sworn affidavit on April 16, 1997 stating that "[he] did recognize [his] voice on the tape."
More importantly, that he explained that "Bobby Manna was not present at the conversation – that other participants
were Dennis Roman and Joe Petrizzo." (Smith Affidavit – April 16, 1997)

stated under oath that she prepared the transcripts of the tapes, and she never attributed any line in any transcript to Mr. Manna…" (Trial Transcript at 2708:15)[10]. Importantly, DeSciscio's name was not in the transcript when Agent Drizella Wells prepared the transcript[11]. Additionally, by Wells' own admissions, the tapes were not clear and she often second guessed herself as to what she heard on the tapes. (Trial Transcript at 2374:8-14). Lastly, despite Wells' clear and unambiguous confirmation that Mr. Smith and Mr. Petrizzo were on site and engaged in the August 5, 1988 conversation, Mullaney and U.S. Attorney Beardell failed to apprise the court of the same.

Moreover, Special Agent Damon Taylor, a supervisor, investigating during the relevant time period and assigned to the C-6 squad, stated that "no agent made any voice identifications or voice comparisons concerning any of the recorded conversations provided by the Newark Division…" **Exhibit E – Damon Taylor Affidavit.** Agent Taylor goes on to state that subsequent to a two-year investigation… there was no evidence to prove that the Irwin Schiff murder was ordered by any of the defendants. The aforesaid finding was memorialized in a November 2, 1989 memorandum. **Exhibit E.**

Most importantly, the Government could not find an active investigator to testify that DeSciscio was in fact recorded speaking of violating federal laws. As stated herein, the investigators utilized other surveillance methods, including, but not limited to, video surveillance, interception logs, license plates, and pictures, when evaluating whom could be speaking on the intercepted conversations, as they could not dispositively know who was talking. This begs the question of how only Agent Steven Foster, who was not actively investigating the

---

[10] Wells stated in other portions of her deposition that "[She] never put Mr. Manna's name on anything…" (Trial Transcript at 2708:8)

[11] Agent Wells was able to make some voice identifications, including the Voices of Frank Daniello and John Derrico (Trial Transcript at 2320).

defendants, could make such a determination of voice identification, while no other agents currently investigating could do so[12].

     While the Government's failure to properly authentic voices was egregious enough, the defendants, including, but not limited to, DeSciscio, were further denied due process of law, as Judge Barry stated that it was in her "judgment, the defense transcripts should not come into evidence…. There has been no testimony as to who prepared the transcripts, and no testimony that the transcripts are accurate renditions of what is on the tapes…" (Trial Transcript at 184:9-18).  Manna sought a similar voice evaluation during trial that was rejected at that time. (Trial Transcript at 6932-6935). It was not until years later that Manna engaged the professional services of Joel Charles, who utilized state of the art equipment, and determined the speakers of the August 5, 1987 tapes, none of which her DeSciscio, Manna, or Casella.

     The evidence now available, including but not limited to, the video and logs, which dispositively prove that Casella was not possibly the speaker, crumbles the Government's assertions and casts doubt on their whole case. As stated throughout, DeSciscio has continuously maintained his innocence and has sought all wrongfully held exculpatory material from the Government. Also, Manna has taken additional steps to dispositively prove his innocence, which ended up being additional steps to dispositively prove DeSciscio's innocence, including, but not limited to, hiring a voice expert (Joel Charles) and having a true and accurate reenactment of the August 5, 1988 conversation, of which the voices depicted were determined to be identical to those of the Government's tape.[13]

---

[12] Through Agent Foster's investigation prior investigation, he knew the identity of Thomas Smith and Torre
[13] Due to the size of the file and the type of digital file, said reenactment shall be produced upon request.

**FAILURE TO PROVIDE EVIDENCE OF MARTIN CASELLA'S LEAVING PRIOR TO THE RECORDING, WHICH THE GOVERNMENT FALSELY REPRESENTED TO THE COURT AS DEPICTING CASELLA IN AN INCRIMINATING CONVERSATION**

When the Government presented their erroneous transcript of the alleged criminal conversation of August 5, 1987, the Government had dispositive evidence, which if turned over to the defense, would have produced a non-guilty verdict as to DeSciscio and his co-defendants. The Government was in possession of video surveillance, depicting Martin Casella leaving the restaurant prior to the alleged criminal conversation of August 5, 1988, and not returning until long after the alleged criminal conversation[14]. **Exhibit C.** This was averred to be an accurate transcription of a conversation that the Government presented as evidence to the murder of Schiff, with Casella as a party to the conversation.[15]

## UNCONSTITUTIONAL IDENTIFICATION

To assure a lengthy sentence, the Government needed to manufacture a connection between their misrepresented recording and an overt act, by finding a weak and fraudulent link. To do so, the Government withheld additional exculpatory evidence which would have again assisted in DeSciscio's defense, including a memorandum to the SAC II New York from an unknown SSA; a teletype from Newark to New York which was a cover letter for DeSciscio's photo; and a portion of a witness statement stating in sum and substance that "she was unable to identify any of these individuals…" **Exhibit F – Teletype.** The question then is, was this the Government's star witness, Vivian Lewis? If these materials would have been disclosed at the time of trial, defense counsel could have properly prepared, and cross-examined Mrs. Lewis, regarding her unequivocal identification.

---

[14] The Government had prior knowledge of who owned the white Lincoln with the license plate 481-ZUB.

[15] By the Governments own witness admissions (assigned FBI Agents testimony), the recording was not clear and no assigned agent that testified associated the voices recorded to DeSciscio or his co-defendants.

After disregarding every single procedural safeguard, to ensure proper identification, the Government continued to successfully manufacture a conviction as:

- there was no photo array or lineup[16]; and

- the Government chose the most suggestive of locations, within the United States Courthouse, where it presented DeSciscio in a negative light.

The Government attempted to link the August 5, 1987 recording to the Irwin Schiff murder by **calling a witness whom neither saw the murder nor had an any consistent statements,** and in their last-ditch effort to tie their fraudulent case together**,** they paraded DeSciscio before Lewis while in a United States Courthouse.

A review of the record makes it clear that Lewis' statements were inconsistent and at times tested the very limits of reasonableness. The concurring decision in *Dennis,* by Chief Judge McKee, is nothing less than a master tutorial on the fallibility of eyewitness testimony, especially when improperly acquired. *Court of Appeals for the Third Circuit, 13-9003* (August 23, 2016) (J. McKee concurring). Judge McKee simply eviscerates the testimony of three eyewitnesses presented in *Dennis* by illuminating the suggestive manner in which the identifications were obtained. *Id*. He does so by using the latest science and studies with regard to system variables, including blinded versus non-blinded procedures, pre-identification instructions, photo array and line-up construction, witness feedback, and multiple viewings. Additionally, Judge McKee addresses estimator variables, including stress, weapon focus, memory decay, and exposure duration, distance, and lighting; all of which lead Judge McKee to conclude that if

> "the jury been properly informed of the problems associated with the procedures used to solicit the identifications, as well as the numerous estimator values that could have affected them, the jurors may well have concluded that James Dennis was not the one who shot Chedall Williams." [*Id*. at 54]

---

[16] The Government Concedes (Trial Transcript at 5104)

If the identification procedures employed in *Dennis* lead to the aforementioned conclusion, then any jurist would be appalled by the procedures used in the instant case.

In addition to the high likelihood that, in light of *Dennis*, a court, if apprised of *all* the relevant factors, would have found that the identification in the instant case was problematic, the *Manson* court cited five factors that should also be taken into account:

> (1) The opportunity to view the criminal at the time of the crime;
> (2) The witness's degree of attention;
> (3) The accuracy of the witnesses prior description;
> (4) The level of the witness's certainty; and
> (5) The length of time between the crime and the confrontation.

[*Manson v. Brathwaite,* 432 U.S. 98, 114 (1977)]

Here, Lewis was not shown a photo array or presented a line-up, the lighting was extremely poor, and by Lewis' own admission, she did not want to disappoint Assistant District Attorney Dugan (Trial Transcript at 5083). Additionally, Lewis identified DeSciscio in a highly suggestive environment, at the United States Courthouse. Stated differently, Lewis saw someone in a "poorly lit hallway for four seconds." (Trial Transcript at 5060). During testimony, Lewis could not describe one facial feature, and most importantly, Lewis' description did not remotely match DeSciscio. (Trial Transcript at 5081).  At no time was Lewis certain that DeSciscio was the man that was in her hallway more than five months prior.[17] (Trial Transcript at 5108).

In sum, Lewis originally stated that she saw a white male, dark suit, black hair (Trial Transcript at 5080). Then, two weeks thereafter, Lewis expands her description, stating that the man she saw was 6'2" to 6'3", athletic and well-built, with black hair and broad shoulders, and around 37-years-old. (Trial Transcript at 5081). Then, before a grand jury, Lewis testified that in addition to the prior description, the man looked like he could be a boxer, tough, like someone you wouldn't want to reckon with. (Trial Transcript at 5089.). Lewis' improved memory of her

---

[17] Lewis statements to police officers is that the man she saw was wearing a hood.

four-second encounter only came after she recorded her desire not to disappoint Dugan. (Trial Transcript at 5083).

*5 Months Later*

On January 8, 1988, investigators staged an unduly suggestive scenario, in the United States Courtroom, where they knew DeSciscio would be exiting, and advised Lewis of such. Upon his departure with another white male, the two were conversating that "there are cops at the end of the hall[18], and Lewis was able to hear their words. DeSciscio avers that the overheard statement, in and of itself, was highly prejudicial as it could have been taken by Lewis as undue worry on these men's part about the identification team she was part of. Furthermore, only after five hours, in a highly suggestive setting, was Lewis able to make an identification, of which she was not positive, as Lewis states, "[I]'m almost positive that was him…" and she goes on to say that "he changed his hair" and he "seems smaller." **Exhibit G – Investigation Report.**

Taking the aforesaid poor identification into account, it should be noted that DeSciscio does not resemble the man that the Government's only witness allegedly saw:

> A:   "[G]ood shoulders, strong looking, like he had been a boxer or somebody tough – you know –like robust, for sure you know – somebody that you wouldn't want to reckon with if you had to. , slight build and thinning brown/gray hair.
>
> Q:   Was he fat, was he skinny?
>
> A:   "No he was not fa at all he was not skinny he was well built like an athlete."

> **[Exhibit H –Lewis Trial Transcript at 2218-2226; Exhibit I – Lewis Cross-Examination]**

It is important to note that DeSciscio has light hair and is everything opposite of a robust man, whom one wouldn't reckon with. And at no time in his life, even 30 years ago, could he have

---

[18]Cops and Agents were stationed at the end of the hall for the identification procedure.

been confused with such a description. Moreover, Lewis' first description stated that the man she had seen had a hood on his head; again, a direct contradiction to Lewis' testimony. **Exhibit J – Memorandum of Lewis Description.** Thus, had the Government turned over the whole investigation file, it is indisputable that DeSciscio would not have been implicated in the herein murder; and, more importantly, that the August 5, 1988 tapes would not and could not have been tied to the Schiff murder.

The obvious inconsistency between description and identification is as dismaying as is the procedures used to obtain the faulty identification, which violated every known scientific and procedural standard, as well as DeSciscio's constitutional rights.

### *Withholding Exculpatory Evidence as to the Schiff Murder*

It has been well-established, as discussed above, from Lewis' testimony as well as the Government's assertions, that Lewis was never shown a photo-array. However, the FBI teletype from Newark to New York clearly states that a photograph of DeSciscio was provided by Newark to someone in the NYPD, who was working jointly with the C6-Squad of the New York office. **Exhibit F.** The photograph was provided so that a photo spread could be shown to assist in the Irwin Schiff murder investigation, and the results of the photo spread then should have been refurnished to the Newark office. The implementation of a photo spread is further acknowledged in a portion of an interview with an unknown female witness. Therein it is stated that the unknown woman was shown a series of six photos and **she was unable to identify any individuals**. These withheld documents go to the question of Lewis and the Government's truthfulness about Lewis never seeing a photo-array; or whether there were other witnesses that the defense was not made aware of.

The pertinence of these questions are given even more weight when a memorandum to SACII New York from UNSSA is factored in. The memorandum establishes that the writer, UNSSA, responded to the Schiff crime scene shortly after the murder. At the scene, he met with SAC Joseph Koletar who introduced UNSSA to the NYPD personnel directly involved in the homicide investigation. Under the "Facts and Circumstance Surrounding Homicide," it states, in important part, that at approximately 10:30 PM, a tenant in the 1452 residential building was leaving the building and observed at least one male individual with what she described as a hood on his head standing in the other restaurant fire exit door. The identity of this witness was not provided at [that] time. **Exhibit F.**

None of these reports name the female witness or witnesses, so it is indiscernible if these females are Lewis or other unknown female witnesses.  However, it was later made clear, through Agent Koletar's memo of August 10, 1987, that Lewis was in fact the only witness.[19] As there is but one hallway adjacent to the restaurant, and Lewis testified that she was in that hallway and observed a man there, logic would dictate that the witness statement memorialized in the UNSSA memo about the man in a "hood" being in the hallway is attributable to Lewis. If so, the memo is impeachment material that fits squarely within the purview of *Brady,* as does the teletype of the interview concerning the photo array, if it is determined that they referenced Lewis. Additionally, in a state grand jury proceeding, neither Lewis nor the assigned testifying detective mentioned Koletar's memo or a man in a hood. This in and of itself contradicts Lewis' manufactured testimony. As the State's Attorney, Mr. Dugan sought Lewis' consent to travel to the New Jersey District Court, to identify the "man in the hood." Thereafter, at trial, Lewis

---

[19] Agent Koletar's memorandum of August 10, 1987 was deliberately withheld from Defense counsel, and but for the withheld information, Agent Koletar would have been called by Defense and would have discredited Lewis' manufactured testimony. According to page 7 of Koletar's memo, Newark FBI was aware of his findings. Additionally, on the first page, Koletar states with certainty, that the supervising agent Jule Bunovolta was given a copy of the memo.

identified DeSciscio as the man she saw in the hall, due to his "slick back black hair," which DeSciscio does not have, and she would not have been able to view on the night, as she only saw a "man with a hood."

Had defense counsel been in possession of these documents during trial, they could have been used to challenge Lewis' and the Government's truthfulness about whether photo arrays were employed; and, even more importantly, the memo would have been used to directly contradict Lewis' testimony and identification concerning the man she says she saw in the hall. The type of impeachment evidence provided by this material would have undercut the credibility of the key, and only, prosecution witness in a matter not duplicated by other challenges the defense was able to level at trial. Consequently, the impeachment material provided by the suppressed documents is material that was required to be produced to DeSciscio, pursuant to *Brady*.

### THE GOVERNMENT FAILED TO PRODUCE EXCULPATORY PEN-REGISTRY EVIDENCE WHICH PROVES DESCISCIO WAS NOT INVOVLED IN THE ALLEGED GAMBLING RING

In addition to the aforesaid prosecutorial misconduct, the Government misled this Court when it proffered evidence of an alleged gambling ring that they knew had no place in the instant action. The Government failed to produce a "pen-registry" that showed a pattern of calls between Mastrogiovanni, Viggiani and an individual named Bobby Delvescovo. At some time thereafter, but before trial, Delvescovo admitted that he was previously incarcerated on a gambling charge and that he takes bets on numbers. **Exhibit K – Delvescovo Documents.** The custodian of records, Agent Dickson, failed to offer any testimony that the numbers led him away from the named defendants and to a "Bobby Delvescovo," an individual whom Dickson personally

interviewed. Again, by design, the Government manufactured the conviction, to further their win at any cost agenda.

The aforementioned interview took place seven months prior to DeSciscio's trial, yet neither the interview nor the Mastrogiovanni phone evidence was disclosed to Defense counsel. However, at trial, the Government furthered their fraud on the court by purporting that the calls on November 12, 1987 to "Bobby" were made to Manna, when in fact they knew for certain that was not the case. In sum and substance, the Government purported at trial that Mastrogiovanni and Viggiani in those phone calls were seeking counsel from their hierarchy in the gambling business. (Trial Transcript summation: 133-134). Manna was alleged by the Government to be the "Bobby" that Mastrogiovanni and Viggiani were attempting to get guidance from when they knew definitively that the "Bobby" on the other end of those phone calls was Bobby Delvescovo.

The Government's fraudulent and misleading conduct continued throughout trial, and but for the Government withholding certain exculpatory evidence in the instant case regarding the gambling charge, DeSciscio could have presented to the jury a defense of an "other person." Furthermore, counsel could have used the information to challenge the accuracy of the Government's investigation. That said, like others, these documents were also *Brady* material.

Moreover, during testimony from Agent Dickson at trial, Agent Dickson failed to divulge exculpatory information, which he was privy to; specifically, the "*pen-registry*" and recording of November 12, 1987, as it pertained to the alleged gambling investigation. DeSciscio holds firmly that the Government knew that the individual referred to on the call was not Manna, but one Bob Delvescovo. More importantly, Janet Mastrogiovanni was neither related to nor had any information regarding DeSciscio or Manna. This was known to the Government but hidden, and

only revealed years later via persistent FOIA requests, which include, *inter alia*, memorandum, documents, and tapes.[20]

## PROSECUTORIAL MISCONDUCT

When a conviction is obtained by the presentation of testimony known to the prosecuting authorities to have been perjured, due process is violated. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935).  In *Jencks v. United States*, in the exercise of its supervisory power over the federal courts, the Court held that the defense was entitled to obtain, for impeachment purposes, statements which had been made to government agents by government witnesses during the investigatory stage. 353 U.S. 657 (1957); *Scales v. United States*, 367 U.S. 203, 257-58 (1961). A subsequent statute modified, but largely codified, the decision, and was upheld by the Court. *Palermo v. United States*, 360 U.S. 343 (1959) (sustaining 18 U.S.C. § 3500).

Here, the Government unequivocally stated there was in fact no exculpatory evidence, and unlike *Strickler*, there was no good faith offer by the Government to have Defense review certain records. Additionally, there were multiple occasions that the Assistant United States Attorney made misrepresentations to the Court that they knew to be false and/or misleading and failed to correct the same, despite having dispositive documentary evidence to the contrary. In addition to the Government's aforementioned misconduct, and its win at any cost position, whereby the Government failed to introduce mandatory exculpatory evidence of the August 5, 1987 recordings, including, but not limited to, line-sheets and other video, the Government has also failed to produce exculpatory statements from other jurisdictions. It is indisputable that the Newark office was working in tandem with investigators in New York, which should have had a

---

[20] To date, it has been confirmed that the Government has still failed to provide nearly 10,000 pages of discovery, of which Manna believes consists of even more exculpatory evidence, in violation of Brady.

free flow of information, as the Newark office sought certain 302's from New York that were never produced.[21]

## FUNDAMENTAL MISCARRAIGE OF JUSTICE

This Circuit has consistently held that individuals should have the right to a fair trial and be provided with all evidence prior so that they may adequately defend their liberty interests.  In the instant case, it is clear that the Government's motive superseded DeSciscio's individual rights, and the Government would go to any lengths to assure DeSciscio's unlawful imprisonment.

In *Banks*, it was conceded that the prosecution failed to disclose the informant's status and did not correct the informant's false testimony that he did not talk to police until shortly before trial. 540 U.S. 668 (2004). The United States Supreme Court held the inmate's claim was not barred since the inmate showed cause for failing to develop the claim in state court and the impeachment evidence was clearly material. The inmate's failure to investigate the informant's status resulted from the prosecution's persistent misrepresentations and omissions concerning such status, and the inmate was entitled to credit the prosecutions. *Id*. at 674.

Akin to DeSciscio's case, but for the prosecution's failure to disclose relevant information, including but not limited to the "interception logs" and the video surveillance, DeSciscio's defense would have been strategized differently.  Moreover, if this evidence would have been presented to the Grand Jury, no indictment would have ever hit the courts as it is inconceivable that DeSciscio, Manna, or Casella was involved in the alleged criminal conversation.

---

[21] New York investigation memorandum of March 25, 1988 sought information regarding the Schiff murder, which was never turned over.

The petitioner in *Dennis* was entitled to habeas relief under 28 U.S.C.S. § 2254 on petitioner's *Brady* claims, based on evidence that included a witness's receipt that corroborated petitioner's alibi, a police activity sheet memorializing that a witness had given a previous statement inconsistent with her testimony at trial, documents regarding a tip from an inmate, and their cumulative prejudice; the Pennsylvania Supreme Court unreasonably applying *Brady* and its progeny in evaluating the receipt and making unreasonable determinations of fact; and that there was a reasonable probability that, had the police activity sheet been disclosed, the jury would have had a reasonable doubt as to petitioner's guilt. The Pennsylvania Supreme Court's characterization of admissibility as a separate, independent prong of *Brady* effectively added admissibility as a requirement. *Dennis*, 834 F.3d at 269.

Like in *Dennis*, the material withheld by the Government was in fact material to DeSciscio's defense and vindication. That said, but for the Government's ulterior motive, DeSciscio would have been found not guilty subsequent the three-month trial, as there is and was a substantial amount of evidence to place doubt within the mind of the jury.

### *Relief Requested due to the "Substantial Miscarriage of Justice"*

But for the Government's malicious win at any cost agenda, the Government continuously manufactured their case in chief and omitted pertinent exculpatory evidence. As enumerated throughout, the Government's calculated tactics could not be defeated without the evidence which is now in the hands of the Defendant through his diligent efforts coupled with the negligence of the custodian of records. DeSciscio, like all defendants, has the fundamental right to a fair trial, which was clearly abrogated by the ill intent of the Government, at which time they created a substantial miscarriage of justice by way of fraud upon the Court only to the detriment of DeSciscio.

26

Due process requires the prosecution to inform the defense of evidence material to guilt or punishment. The prosecution must also disclose evidence that goes to the credibility of crucial prosecution witnesses. However, the prosecution's failure to disclose such evidence amounts to a violation of due process only if there is a reasonable probability that the jury would have returned a different verdict if the information had been disclosed.

Although the constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense, and a *Brady* violation does not mandate automatic reversal, a reversal is warranted only where the suppression of the *Brady* evidence undermines confidence in the outcome of the trial. In evaluating whether the government's failure to turn over *Brady* material undermines confidence in the outcome of the trial, the suppressed evidence is considered collectively, not item-by-item. *Buehl v. Vaughn*, 166 F.3d 163, 166 (3d Cir. 1999).

DeSciscio was denied due process of law. After serving more than 30 years and with his health on a rapid decline, DeSciscio respectfully requests that this Court fashion a new sentence, premised on the aforesaid violations of DeSciscio's constitutional protections premised, pursuant to 18 U.S.C. § 3582; as DeSciscio has been unlawfully incarcerated. Moreover, DeSciscio incorporates herein by reference and renews the prior requests made in *Dkts* 5 and 10 of CR-88-239.

**CONCLUSION**

For the foregoing reasons, it is respectfully submitted that this Court should grant

Defendant Richard DeSciscio's motion to vacate his judgment and conviction pursuant to 28

U.S.C. § 2241; or, alternatively, to modify his sentence pursuant to 18 U.S.C. § 3582.

Respectfully submitted,

_**s/ Marco A. Laracca**_
Marco A. Laracca, Esq.
BIO & LARACCA, P.C.
331 Central Avenue
Orange, NJ 07050
T: (973) 675-6006
F: (973) 675-7333
E: mlaracca@bioandlaracca.com
_Attorney for Defendant Richard DeSciscio_

Dated: April 28, 2021

28